IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD EDWARD JEFFERSON,<br><br>     Petitioner,<br><br>    vs.<br><br>BRIAN DUFFY, Warden, California<br>Medical Facility,[1]<br><br>     Respondent. | No. 2:12-cv-2839-JKS<br><br>MEMORANDUM DECISION |

Donald Edward Jefferson, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Jefferson is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the California Medical Facility.  Respondent has answered, and Jefferson has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On May 15, 2009, Jefferson was charged by information with eleven counts alleging violations of California Penal Code § 475(c), the unlawful possession of fraudulent checks.  The information also alleged that Jefferson had one prior strike conviction[2] and had previously served four prior prison terms.[3]

On direct appeal, the California Court of Appeal summarized the facts underlying Jefferson's indictment as follows:

---

[1]   Brian Duffy, Warden, California Medical Facility, is substituted for Terri Gonzalez, former Warden, California Men's Colony.  FED. R. CIV. P. 25(c).

[2]   *See* CAL. PENAL CODE §§ 667(b)-(i).

[3]   *See* CAL. PENAL CODE § 667.5(d).

In July 2008 (all further unspecified calendar dates are to that year), Ardith Bagwell's home was burglarized and her checks were taken.  On August 7 and 8, checks for $4,000 and $2,500, respectively, written from Bagwell's account and made payable to Amerida Corona, were deposited into Corona's Golden 1 Credit Union (Golden 1) account.  Bagwell has never met Corona or [Jefferson] and did not sign the checks.

In August 2008, Nadine Yassa's home was burglarized and some of her checks were stolen.  Subsequently, seven checks written on Yassa's Wells Fargo bank account were deposited into the Golden 1 accounts of Corona and Kristopher Lindley.  Three of the checks were made payable to Lindley and four were made payable to Corona.  Yassa did not write any of the checks, nor does she know Lindley, Corona or [Jefferson].

Corona, testifying under a grant of immunity, stated that [Jefferson] told her he needed a bank account to deposit checks because he was having trouble with the Internal Revenue Service.  She agreed to allow [Jefferson] to use her automated teller machine (ATM) card and password identification number (PIN) on the promise that he would give her 10 percent of every check he deposited into her account.  Corona went with [Jefferson] to deposit the first check.  Thereafter, [Jefferson] used her ATM card and PIN number to make deposits and withdrawals.  Bank records and surveillance footage established that [Jefferson] used Golden 1 ATM machines to make several deposits and withdrawals into and out of Corona's account.

Lindley testified under a grant of immunity.  He was introduced to [Jefferson] by Torrey Love, who told him there was "somebody [Love] knew who had ways of getting [Lindley] money."  At first, Lindley understood only that if he allowed [Jefferson] use of his bank account card and PIN number, he could earn $1,500.  After Love drove Lindley to meet [Jefferson], the scheme was explained to him by [Jefferson] in more detail.

[Jefferson] told Lindley he was "scamming the bank," by writing blank checks using other people's signatures, depositing them in an ATM machine and withdrawing money.  Lindley agreed to give [Jefferson] the ATM card and PIN number to his Golden 1 savings account.  At [Jefferson's] behest, Lindley wrote his signature on a piece of paper, so [Jefferson] could practice writing it.  In furtherance of the plan, and to make it appear that Lindley was not part of the scheme, he made a false report to Golden 1 that his ATM card and PIN number had been stolen.

When shown a series of checks that were deposited into his Golden 1 savings account, Lindley said he actually endorsed one of them, but that the others were written by [Jefferson], who forged his signature.  [Jefferson] promised Lindley $1,500 for his participation in the scheme, but Lindley received only $100.  Lindley was eventually convicted of check fraud in connection with this case.

It was undisputed that seven checks written from Yassa's bank account, three of them payable to Lindley and four payable to Corona, were deposited by [Jefferson] into Lindley's Golden 1 account.  [Jefferson] withdrew at least $500 from the same account.

When [Jefferson] was interviewed in jail following his arrest he denied knowing Lindley and claimed he had never seen him before.  He also denied having ever seen the canceled checks bearing Lindley's signature.  When confronted with a surveillance photo showing him making a deposit at an ATM machine using Lindley's account, [Jefferson]

denied that the photo was of him and maintained that "[he] didn't put any checks in any dude's account."

**Defense**

      [Jefferson] testified that he ran his own music business, in which he sold large quantities of compact discs (CD's) to individuals.  He claimed to have met Ardith Bagwell at a club.  Two months later, Bagwell introduced him to Yassa.  [Jefferson] testified that each of these women purchased hundreds of CD's from him, and paid him with checks.  [Jefferson] testified that Corona and Lindley allowed him to use their accounts to deposit the checks and withdraw cash, because he was having trouble establishing his own bank account.  He believed that the checks written by Yassa and Bagwell were legitimate.

      Two defense witnesses testified that [Jefferson] ran his own music business for a number of years and sold CD's in connection with that business.

Jefferson proceeded to jury trial on December 9, 2009.  On December 15, 2009, the court granted Jefferson's motion to dismiss two of the counts due to the prosecution's inability to procure the witness who could attest to the alleged violations.  Before the close of the defense case, the court granted Jefferson's request to represent himself.  At the conclusion of trial, the jury found Jefferson guilty of the remaining nine counts on December 22, 2009.  The following day, a deputy sheriff testified that Jefferson refused to be transported for court.  The court found that Jefferson "knowingly, voluntarily and intelligently" waived his appearance for the day, and the court held in his absence a bench trial as to the prior convictions alleged in the information.  The court subsequently found true all the enhancements alleged in the information.

On January 19, 2010, the court re-appointed counsel to represent Jefferson.  Counsel moved for the trial court to strike Jefferson's prior conviction pursuant to *People v. Superior Court (Romero)*, 917 P.2d 628 (Cal. 1996).  The court denied Jefferson's *Romero* motion and sentenced him to a total of 15 years and 4 months in state prison.  The court further imposed a restitution fine and ordered Jefferson to pay restitution to the victims.

Through counsel, Jefferson appealed the conviction, arguing that: 1) the trial court erred by denying his motion for a mistrial; 2) the trial court impermissibly failed to give accomplice instruction as to one witness; 3) the trial court committed reversible error by refusing to give a pinpoint instruction that three prosecution witnesses had been granted immunity; 4) his constitutional rights were violated when the trial court prevented him from calling certain witnesses unless he personally testified; 5) the trial court erroneously granted Jefferson's motion to represent himself; 6) the trial court imposed "the equivalent of physical restraints" when it required Jefferson to remain seated at counsel's table when delivering his closing argument; 8) the true findings on the prior allegations must be reversed because Jefferson was not present at the bench trial conducted on the priors; and 9) cumulative error required reversal.  Jefferson also filed a supplemental brief contending that he was subjected to multiple convictions in violation of state sentencing law and the federal protections against double jeopardy.

In a reasoned opinion, the California Court of Appeal affirmed Jefferson's conviction in its entirety.  Jefferson petitioned for review of the denial to the California Supreme Court, which was summarily denied on December 21, 2011.

Jefferson timely filed a Petition for a Writ of Habeas Corpus to this Court.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Jefferson asserts five grounds for habeas relief.  First, Jefferson contends that the trial court's true findings on the prior allegations must be reversed because the trial court conducted a bench trial on the priors in Jefferson's absence.  Second, Jefferson claims that the trial court violated his constitutional rights by preventing him from calling certain witnesses and introducing particular evidence unless he testified.  Third, Jefferson argues that the

trial court erred by "imposing the equivalent of physical restraints" on him by prohibiting him from standing when addressing the jury during closing argument. Fourth, Jefferson contends that eight of the nine convictions must be reversed because the multiple convictions for possessing fraudulent checks violate state sentencing law and federal protections against double jeopardy. Finally, Jefferson claims that the trial court erred when it refused the defense's request to give a jury instruction advising that three of the prosecution's witnesses had been granted immunity.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Claim One: Absence from bench trial on priors

Jefferson first argues that the trial court's true findings on the five prior allegations must be reversed because the trial court conducted the bench trial on the priors when Jefferson was

absent from trial and, because he was representing himself, had no counsel appear on his behalf.

Jefferson contends that the procedure deprived him of due process and his right to counsel.

In rejecting this claim on direct appeal, the Court of Appeal described the events

underlying this claim:

> Immediately after the guilty verdicts were rendered, [Jefferson]—after being fully advised—waived his right to a jury trial on the truth of prior felony convictions.
> The next day, the court announced that the bailiff had received a message from the jail indicating that [Jefferson] did not want to come to court that day.  Deputy James Russell of the Sacramento County Sheriff's Department then testified that, according to the "pull list" which the department compiles, [Jefferson] had refused to come to court, telling one of the officers, "I was found guilty yesterday, I don't give a shit."  The trial judge then announced, "I find that the defendant, Mr. Jefferson, has intentionally, willfully and knowingly, voluntarily absented himself from the proceeding, intentionally choosing not to appear."  A brief trial on the priors was conducted in [Jefferson's] absence, based solely on documentary evidence.

Jefferson argued on direct appeal that the trial court's decision to proceed in his absence

violated his constitutional right under state law to be present at all stages of the proceedings.

The appellate court noted that Jefferson did not dispute that his absence was voluntary and thus

could be validly waived under state law.  The court further rejected any contention that Jefferson

"could unilaterally bring a halt to the proceedings merely by refusing to come out of his jail cell

and appear for trial."

Under the Due Process Clause, a criminal defendant has a right to be present at any stage

of the criminal proceeding that is critical to its outcome if his presence would contribute to the

fairness or reliability of the procedure.  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *United

States v. Gagnon*, 470 U.S. 522, 526-27 (1985) (per curiam).  A defendant must be allowed to be

present "to the extent that a fair and just hearing would be thwarted by his absence."  *Stincer*,

482 U.S. at 745 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)).  However, "th[e]

privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'"  *Stincer*, 482 U.S. at 745 (quoting *Snyder*, 291 U.S. at 106-07); *see also Gagnon*, 470 U.S. at 527 (defendants' absence did not violate the Due Process Clause where their presence was not needed to "ensure fundamental fairness" and they could not have added to or gained from being present at the conference).

Additionally, the right to be present at every stage of his trial may be waived by a defendant who voluntarily absents himself from trial.  *See Taylor v. United States*, 414 U.S. 17, 18-20 (1973) (per curiam); *Diaz v. United States*, 223 U.S. 442, 455 (1912); *Brewer v. Raines*, 670 F.2d 117, 119 (9th Cir. 1982) ("When, after sufficient notice, a defendant voluntarily absents himself from any proceeding, he waives any right he has to be present at that proceeding."). Other courts have allowed waiver of appearance even where the defendant is proceeding *pro se*. *See Thomas v. Carroll*, 581 F.3d 118, 126-27 (3d Cir. 2009), *cert. denied*, 130 S. Ct. 3462 (2010) (state court's conclusion that defendant's Sixth Amendment rights were not violated when the trial court conducted defendant's trial without anyone present for the defense after defendant elected to represent himself and then voluntarily absented himself from trial to protest the trial court's rulings was not contrary to, or an unreasonable application of, clearly established federal law); *Clark v. Perez*, 510 F.3d 382, 396 (2d Cir. 2008), *cert. denied*, 555 U.S. 823 (2008) ("[T]here was no constitutional violation because [defendant] knowingly and intelligently waived her right to counsel, unequivocally asserted her right to self-representation, made a conscious strategic choice to waive her right to be present in the courtroom as part of a *de facto* political protest defense, and was afforded the opportunity to return whenever she chose.").

The appellate court noted that Jefferson did not contest that he voluntarily failed to appear at trial.  Although not explicitly stated, Jefferson suggests in his Traverse that his absence might have been involuntary by asserting that the court found that he waived his right to appear at trial "[t]hrough unreliable sources of information including a third party, . . . where this deputy stated he received information from another sheriff deputy that [Jefferson] had refused to come to court."  Respondent contends that any challenge to the voluntariness of his failure to attend trial is unexhausted.  This Court may not consider claims that have not been fairly presented to the state courts.  28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).  Exhaustion of state remedies requires the petitioner to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.  *Duncan v. Henry*, 513 U.S. 364, 365 (1995).  To have properly exhausted his state court remedies, Jefferson must have presented both the legal arguments and the factual basis to the highest state court.  *See Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir. 2003).  Unexhausted claims must be dismissed.  *See Rhines v. Weber*, 544 U.S. 269, 275-78 (2005).

A review of the record indicates that, contrary to Respondent's assertion, Jefferson argued before the state courts that the trial court erred in finding that Jefferson's absence was voluntary.  In his reply brief in support of his direct appeal, Jefferson argued that the finding was "based on a double hearsay report from a deputy" and that the comment attributed to Jefferson by the deputy "was not a knowing, voluntary, intelligent waiver of his right to be present at a critical state of trial."  It therefore appears that Jefferson exhausted this claim in its entirety.

However, the appellate court's finding that Jefferson voluntarily waived under California law his right to appear at the bench trial on the priors, which was based in part on its assessment of the deputy's credibility, is entitled to a presumption of correctness. *See Bradshaw v. Richey,* 546 U.S. 74, 76 (2005). This Court is precluded from re-weighing the evidence or assessing witness credibility. *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Jefferson's bare assertion that the evidence was insufficient to establish that he was voluntarily absent does not meet his burden of adducing clear and convincing evidence sufficient to overcome the presumption of correctness afforded the trial court's finding. *See* 28 U.S.C. § 2254(e) (1).

Moreover, while Jefferson correctly contends that the deputy's testimony was based on hearsay which may raise a confrontation problem, the admission of the statement to prove that Jefferson refused to come to court is subject to harmless error analysis. There is no basis to conclude that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict" or that it actually prejudiced Jefferson, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), because the only issue at the bench trial was Jefferson's prior convictions, which he does not dispute.

In his Petition to this Court, as he did on direct appeal of his conviction to the state courts, Jefferson does not explicitly state that his absence was involuntary but rather argues that the voluntariness of his absence is irrelevant because his absence during his period of self-representation led to a *per se* requirement that counsel be appointed for him in his stead. The Supreme Court has never rendered such a holding, and therefore it cannot be said that the appellate court's decision declining to do so contravenes or unreasonably applies federal law.

Moreover, even if Jefferson is correct that the trial court erroneously denied him his right to be present at the bench trial, such error does not automatically warrant reversal of the true findings on the priors.  The Ninth Circuit has held that the denial of a defendant's right to be present does not necessarily amount to structural error:

> The Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error.  To the contrary, in *Rushen v. Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (per curiam), the Court determined that the fact that the defendant was denied the right to be present during an ex parte communication between the judge and a juror was a trial error that was subject to harmless error analysis.  The court explained that the right to be present during all critical stages of the proceedings and the right to be represented by counsel, "as with most constitutional rights, are subject to harmless error analysis unless the deprivation, by its very nature, cannot be harmless."  *Id.* at 117 n.2, 464 U.S. 114, 104 S. Ct. 453, 78 L. Ed. 2d 267 (citations omitted).

*Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005).

Jefferson does not demonstrate that he was prejudiced by his absence at the bench trial, which was conducted based solely on documentary evidence and did not include witnesses who Jefferson may have had the right to confront.  He therefore fails to show that any such error was more than harmless.  Accordingly, Jefferson is not entitled to relief on his first claim.

Claim Two: Compulsion to testify

Jefferson next argues that the trial court violated his right against self-incrimination and his rights to a jury trial, to counsel, and to due process by "preventing [Jefferson] from calling defense witnesses and presenting [receipts] unless he testified."

In rejecting this claim on direct appeal, the Court of Appeal described the events underlying this claim:

> Prior to trial, the prosecutor brought a motion in limine precluding [Jefferson] from introducing receipts showing he deposited checks in conjunction with his music

business, unless he first laid a foundation for them by testifying.  No ruling was made at that time.

  The subject came up at a midtrial conference in chambers, wherein the trial court stated: "Counsel, my feeling is that if [Jefferson] testifies and he places himself in a legitimate business as a defense to the charge, then there would be some probative value to other witnesses who would corroborate that testimony.  So I would be inclined to allow you, [defense counsel], to call some witnesses if [Jefferson] testifies on that issue.  If [Jefferson] doesn't testify on that issue, I don't think it would be appropriate to have third party witnesses attempt to create a defense for [Jefferson] by putting him in a legitimate business. [¶] . . . [¶]  So what I will do is read the additional proffers which you gave me this morning in chambers, have you identify for me the say two or three witnesses that are highest on your list of priorities, and we can identify if [Jefferson] testifies which two or three I would allow in."

  Subsequently, [Jefferson] took the stand and testified that he received checks as payment for CD's as part of his music business.  The trial court then permitted the defense, over the People's objection, to call witnesses to corroborate his claim that he had been in the music business for several years.  The court also allowed [Jefferson] to introduce copies of receipts for purchases of CD's in 2008.

The appellate court then denied the claim.  It first determined that Jefferson failed to preserve it below and thus forfeited his right under state law to raise the claim on appeal.  The court alternatively concluded that the claim failed on the merits:

  [Jefferson] and his corroborating witnesses were permitted to testify without restriction, and all of the receipts he wanted introduced were admitted.  [Jefferson] cannot seriously claim that the outcome of the case would have been any different had the trial court not made a tentative ruling that he had to testify before the receipts would be admitted.  No reversible error appears.

As an initial matter, because the state appellate court found Jefferson's claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a

complete failure to object at trial.  *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  Because the state appellate court held that the claim was thereby forfeited under California's contemporaneous objection rule, Jefferson's claim may be deemed procedurally defaulted.

The claim still must fail even when considering the merits.  Jefferson's claim involves the same issue presented to the Ninth Circuit in *Menendez v. Terhune*, 422 F.3d 1012, 1030-32 (9th Cir. 2005).  In that case, two brothers who were charged with murdering their parents sought to introduce testimony from witnesses concerning alleged parental abuse.  *Id.* at 1030.  The trial court ruled that the defendants would have to lay a foundation for the proffered testimony by testifying about their actual belief of imminent danger from their parents.  *Id.* at 1030-31.  Given the court's ruling, one brother testified but the other did not.  *Id.* at 1031.  On habeas review, the brothers argued that the trial court's ruling effectively forced them to choose between their Fifth Amendment right against self-incrimination and their Sixth Amendment right to present a defense.  *Id.*  The Ninth Circuit affirmed the district court's denial of relief, holding that "[a]s a matter of state evidence law, a foundation had to be laid before the evidence could be admitted . . . .  The judge did not require the defendants to take the stand; he merely regulated the admission of evidence, and his commentary on what might constitute a foundation did not infringe on Petitioners' right to decide whether to testify."  *Id.* at 1032.  These same reasons doom Jefferson's claim here.

Moreover, even if Jefferson could prove that the trial court erred, the appellate court properly determined that Jefferson failed to show that he suffered any prejudice.  Jefferson had the opportunity to decide whether or not to testify, and he cannot show that the need for

13

Jefferson to testify first to lay the foundation for the testimony of the conditional witnesses prejudiced his defense.  Jefferson cannot prevail on this claim in any event.

Claim Three: Restraint during closing argument

Jefferson next contends that "reversal is required because the trial court erred by imposing the equivalent of physical restraints on [Jefferson] when he was *pro per*, and creating disparity between him and the prosecutor by prohibiting him from standing [during closing argument] to address the jury while permitting the prosecutor to do so."

In rejecting this claim on direct appeal, the Court of Appeal described the events underlying this claim:

> While defendant was representing himself, the trial judge told [Jefferson]: "All right.  Now there is a security issue, Mr. Jefferson.  Now that you're representing yourself, you will be presenting a closing argument.  Because you are in custody and because you have an extensive felony criminal record, I can't have you walking around the courtroom at will during your closing argument.  The sheriff is in charge of security issues.  The bailiff has advised me of their concern of security issues.  [¶]  You can present your closing argument either standing or sitting at counsel table, whichever you prefer.  It's completely up to you.  If you choose to sit and if you want me to tell the jury that they should not consider that fact for any purpose, I would be happy to do that if you want me to."
> Later in the proceedings, [Jefferson's] escort officer stated that because [Jefferson] had "a serious history of a violent felony [sic]," he preferred that [Jefferson] remain seated during closing argument.  The court ruled that [Jefferson] could either remain seated during closing argument or could stand up at the counsel table with additional security officers present.  [Jefferson] replied, "I'm not going to be actually standing up through my closing," so "[t]hey [the officers] have nothing to worry about."
> [Jefferson] eventually agreed to sit during his summation but asked if the prosecutor was going to be subject to the same restriction.  Although the judge initially agreed, he reversed his ruling after the prosecutor objected.  The judge then offered to give an instruction telling the jury not to draw any inference from the fact that [Jefferson] was seated during closing argument.  [Jefferson] declined the offer, but wanted to tell the jury that "[he] was not allowed to stand during closing."  The trial judge refused the proposal, however, since [Jefferson] had the option of standing with additional security officers present.  The colloquy ended with the agreement that [Jefferson] would be seated during closing argument and the jury would not be given any instruction drawing its attention to that fact.

The appellate court rejected his claims on multiple grounds:

> First, [Jefferson] forfeited the claim by failing to raise a cognizable objection in the trial court.  On the contrary, the record shows that [Jefferson] and the trial judge jockeyed back and forth on the issue until a satisfactory arrangement was agreed upon.
> Second, [Jefferson's] suggestion that preventing him from walking back and forth during closing argument was the functional equivalent of shackling him is spurious.  Restricting a self-represented defendant's movement around the courtroom does not bear any of the indicia of guilt associated with shackles, stun belts or chains.  Thus, the California Supreme Court has recognized that, unlike shackling, other reasonable security measures may be imposed on a defendant without a showing of "manifest need." [*People v. Marks*, 72 P.3d 1222, 1239-40 (Cal. 2003).]  The trial court noted, without objection, that [Jefferson] had "an extensive felony criminal record," and court security personnel were uncomfortable with him roaming the courtroom without additional officers present.  Accordingly, it was reasonable for the court to require [Jefferson] to either stand at the counsel table or sit while delivering closing argument.
> Third, and finally, given the overwhelming evidence of guilt, any restriction imposed on [Jefferson's] movement during closing argument was decidedly harmless under any standard of review.

Because the state appellate court also found this claim forfeited under California's contemporaneous objection rule, the claim is likewise procedurally defaulted from federal habeas review.  *Coleman*, 501 U.S. at 729-30.

Jefferson's claim also fails on the merits.  As the appellate court determined, Jefferson's contention that the court's requirement that he remain seated at counsel's table is tantamount to shackles is "spurious" at best because the restriction "does not bear any of the indicia of guilt associated with shackles, stun belts or chains."  While the Supreme Court has held that restraints such as shackles, stun belts or chains that carry such indicia of guilt may interfere with a defendant's right to an impartial jury, *see Deck v. Missouri*, 544 U.S. 622, 628-29 (2005), the Supreme Court has never held that a defendant who chooses to represent himself must be afforded all privileges and freedom of movement extended to assigned counsel.

Moreover, whether a trial court erred in imposing restraints upon a defendant at trial is reviewed for abuse of discretion. *Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir. 1985). Even if the trial court abused its discretion in restricting Jefferson's movement during closing argument, such error does not warrant habeas relief. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[4] Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))). The appellate court's determination that the restraint applied to Jefferson during closing argument did not violate due process therefore does not contravene or unreasonably apply federal law in any event, and he is not entitled to habeas relief on this ground.

---

[4]     At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000). This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

Claim Four: Multiple convictions

In his fourth claim for relief, Jefferson contends that eight of the nine counts of forgery must be reversed because the separate convictions violate state sentencing law and the federal protection against double jeopardy because, "[u]nder current statutes, the possession of multiple checks in violation of [California Penal Code] section 475 constitutes a single offense, that is a single unit of prosecution, [regardless] of the number of victims or potential victims." The basis for Jefferson's contention is that his convictions arose from his single possession of blank checks at the same time and place, which, according to Jefferson, constituted an indivisible criminal act.

On direct appeal, Jefferson relied on a series of state law decisions holding that a person found in possession of completed forged or blank checks on one occasion can be convicted only of a single count of forgery, despite the fact that there were several checks targeting multiple victims or potential victims.   The Court of Appeal distinguished those decisions:

> None of these "single possession" cases is applicable here because [Jefferson] was convicted of possessing eight individual fraudulent checks on eight different dates. Possession of each check was a separate transaction and [Jefferson] deposited each one into a bank account with intent to defraud.  Accordingly, this case falls within the rule that, where the evidence shows independent acts of unlawful possession on separate occasions, a defendant may be convicted of separate counts based on each possession.

The court further reasoned, "Acceptance of [Jefferson's] argument would mean that a person could write phony checks defrauding multiple victims on multiple occasions, without ever facing exposure to more than one count of completed check forgery.  We reject an interpretation of the statute that would lead to such absurd results."

The Double Jeopardy Clause of the Constitution provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb." U.S. CONST. amend. V.  The clause is enforced against the states through the Fourteenth Amendment. *Benton v. Maryland*,

395 U.S. 784, 787 (1969).  The Supreme Court has previously held that this clause protects

against successive prosecutions for the same offense after acquittal or conviction and against

multiple criminal punishments for the same offense.  *Monge v. California*, 524 U.S. 721, 727-28

(1998) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

The prohibition against multiple punishments "is designed to ensure that the sentencing

discretion of courts is confined to the limits established by the legislature."  *Ohio v. Johnson*,

467 U.S. 493, 499 (1984).  Whether punishments imposed in a single trial are "multiple" for

purposes of double jeopardy is essentially an issue of legislative intent.  *See Missouri v. Hunter*,

459 U.S. 359, 366-68 (1983).  As the Supreme Court has stated:

> In the federal courts the test established in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932), ordinarily determines whether the crimes are indeed separate and whether cumulative punishments may be imposed.  *See Albernaz v. United States*, 450 U.S. 333, 337, 101 S. Ct. 1137, 1141, 67 L. Ed. 2d 275 (1981); *Whalen v. United States*, 445 U.S. 684, 691, 100 S. Ct. 1432, 1437, 63 L. Ed. 2d 715 (1980).  As should be evident from our decision in *Missouri v. Hunter*, however, the *Blockburger* test does not necessarily control the inquiry into the intent of a state legislature.  Even if the crimes are the same under *Blockburger*, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end.

*Johnson*, 467 U.S. at 499 n.8.

Here, in rejecting Jefferson's double jeopardy claim, the Court of Appeal considered the

California cases on which Jefferson primarily was relying and found that the rationale of those

cases did not compel the result he sought.  Pursuant to *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

(1991), it may be presumed that the California Supreme Court, by its subsequent summary denial

of Jefferson's Petition for Review raising the same claim, did not intend to change the California

Court of Appeal's reasoned decision rejecting it.  Jefferson's federal double jeopardy claim turns

on the California Court of Appeal's construction of California law as permitting Jefferson's

18

conviction of two violations of California Penal Code § 475(b) where, at the same time and place, he possessed multiple checks belonging to different people that were deposited at different times.  However, this Court is bound by the Court of Appeal's construction of state law.  *See Bradshaw*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) ("We accept a state court's interpretation of state law, . . . and alleged errors in the application of state law are not cognizable in federal habeas corpus.").  Accordingly, Jefferson's double jeopardy claim fails to provide a basis on which federal habeas relief may be granted.

Claim Five: Failure to give pinpoint credibility instructions

Finally, Jefferson asserts that "[r]eversal is required because the trial court committed prejudicial error by refusing the defense request for a jury instruction advising that three prosecution witnesses had been granted immunity, in violation of [Jefferson's] constitutional right to a fair jury trial, and due process."

In rejecting this claim on direct appeal, the Court of Appeal described the events underlying this claim:

> Before the case went to the jury, [Jefferson] requested a pinpoint instruction singling out Corona and Lindley by name and directing the jurors to determine whether their testimony had been influenced by the grant of immunity each had received.  The trial court declined to do so, pointing out that the subject was covered by the pattern instruction, CALCRIM No. 226.
> In accordance with CALCRIM No. 226, the jury was instructed that, "[i]n evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are: [¶] . . . [¶] Was the witness promised immunity or leniency in exchange for his or her testimony?"

The appellate court then considered and rejected Jefferson's argument that the court's refusal to give a pinpoint instruction as requested was error:

> [Jefferson's] proposed instruction was covered by CALCRIM No. 226, which informed the jury that it may consider any promise of immunity in weighing the credibility of a witness's testimony.  Furthermore, since Lindley and Corona were accomplices as a matter of law, the trial court also gave CALCRIM No. 335, advising the jury that such testimony needed to be independently corroborated before it could be relied upon to convict [Jefferson].
>
> [Jefferson] insists the pattern instruction was insufficient because there is a "vast difference" between a "promise" of immunity as referenced in the standard instruction, and a "grant" of immunity, which was given to the witnesses in this case.  We are unpersuaded.
>
> First, the key point is that the witness *received immunity* for giving testimony damaging to the defendant.  It is doubtful a lay jury would parse any distinction between a "grant" and a "promise" of immunity.  Second, if anything, a "promise" of immunity sounds more damaging to the testifying witness, since it implies his or her testimony is being given as a quid pro quo in exchange for leniency arranged by the district attorney.  Third, [Jefferson] was free to point out in closing argument that the *grant* of immunity given to Lindley and Corona induced them to color their testimony to inculpate [Jefferson].
>
> We conclude the trial court properly rejected [Jefferson's] pinpoint instruction.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990), overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584 (2002).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

The Ninth Circuit has recognized that "it is *not* reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory." *Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995) (quoting *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990)). The state court's determination that the given instructions adequately informed the jury that the testifying witnesses were offered immunity in exchange for their testimony is entitled to this Court's deference. This Court, sitting in federal habeas review, must accept that the California courts correctly applied California laws. *See Bell v. Cone*, 543 U.S. 447, 455 (2005) ("We do not think that a federal court can presume so lightly that a state court failed to apply its own law."); *see also Hicks v.*

21

*Feiock*, 485 U.S. 624, 629-30 n.3 (1988) (noting that a state appellate court's determination of state law is binding and must be given deference).  Given the instruction of CALCRIM No. 226, it cannot be said that "the failure to give [Jefferson's] requested instruction rendered the trial so fundamentally unfair as to violate due process," *Duckett*, 67 F.3d at 746, and Jefferson's claim therefore fails.

V. CONCLUSION AND ORDER

Jefferson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: February 7, 2014.

/s/James K. Singleton, Jr.<br>JAMES K. SINGLETON, JR.<br>United States District Judge

22